# United States Bankruptcy Court

## District of Massachusetts

|  |  |
|---|---|
| In re:<br><br>DEHON, INC.,<br><br>Debtor | Chapter 11<br>Case No. 02-41045-HJB |
| STEPHEN S. GRAY,<br>AS PLAN ADMINISTRATOR OF<br>DEHON, INC.,<br><br>Plaintiff<br><br>v.<br><br>FLORIDA STATE UNIVERSITY,<br><br>Defendant | Adversary Proceeding<br>No. 04-04036-HJB |
| STEPHEN S. GRAY,<br>AS PLAN ADMINISTRATOR OF<br>DEHON, INC.,<br><br>Plaintiff<br><br>v.<br><br>UNIVERSITY OF ALASKA,<br><br>Defendant | Adversary Proceeding<br>No. 04-04040-HJB |

1

STEPHEN S. GRAY,                    )
AS PLAN ADMINISTRATOR OF           )          Adversary Proceeding
DEHON, INC.,                       )          No. 04-04161-HJB
                                   )
            Plaintiff              )
                                   )
v.                                 )
                                   )
UNIVERSITY OF TEXAS AT             )
AUSTIN,                            )
                                   )
            Defendant              )

## MEMORANDUM OF DECISION

Before this Court are motions filed by the University of Alaska, Florida State
University and the University of Texas at Austin (the "Defendants") to dismiss adversary
proceedings brought against them by the Plan Administrator of Dehon, Inc. (the "Debtor").[1]
The Plan Administrator alleges that the Debtor made pre-petition payments to the
Defendants that qualify as preferential transfers pursuant to § 547 of the Bankruptcy Code
and are recoverable under § 550.[2] In addition, the Plan Administrator seeks disallowance,
pursuant to § 502, of claims filed by any Defendant who fails to return an avoided transfer.
The Defendants maintain that this Court lacks jurisdiction over these adversary

---

[1] The Debtor was formerly known as Arthur D. Little, Inc. The Debtor's name was
changed to Dehon, Inc. following a court-approved sale of substantially all of its assets.

[2] Unless otherwise noted, all statutory references are to Title 11 of the United States
Code (the "Bankruptcy Code" or the "Code").

2

proceedings under the Eleventh Amendment to the United States Constitution. The issue

to be determined is whether the Eleventh Amendment prevents this Court from exercising

jurisdiction over the Defendants in the present adversary proceedings.

## I.    FACTS AND TRAVEL OF THE CASE

In contrast to the difficult legal issues, both historic and contemporary, that are

implicated by this case, the facts are mercifully simple, straightforward and undisputed.

The Debtor filed a chapter 11 petition in the United States Bankruptcy Court for the

District of Delaware on February 5, 2002. The case was promptly transferred to the District

of Massachusetts for reasons not here relevant. On February 14, 2003, this Court

confirmed the Debtor's Plan of Reorganization, pursuant to which Stephen S. Gray (the

"Plan Administrator") was appointed to, *inter alia*, collect and disburse assets and, where

appropriate, commence avoidance and recovery actions under the Bankruptcy Code.

In January of 2004, the Plan Administrator filed separate adversary proceedings

against the University of Alaska, Florida State University and the University of Texas at

Austin, in each case seeking to avoid and recover transfers made to the respective

Defendants as preferential transfers pursuant to § 547 of the Bankruptcy Code.[3] The Plan

---

[3] Section 547 allows a trustee or debtor-in-possession (or, as here, a duly appointed
Plan Administrator) to avoid a pre-petition transfer of a debtor's property if the transfer was:
  (1)  to or for the benefit of a creditor;
  (2)  for or on account of an antecedent debt owed by the debtor before such transfer
       was made;
  (3)  made while the debtor was insolvent;
  (4)  made –
       (A)  on or within 90 days before the date of the filing of the petition; or
       (B)  between ninety days and one year before the date of the filing of the
            petition, if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive if –
       (A)   the case were a case under chapter 7 of this title;

Administrator maintains that the Eleventh Amendment to the Constitution does not bar this Court's jurisdiction, regardless of whether the Defendants qualify as instrumentalities of their respective States, because Congress has validly abrogated the States' sovereign immunity through § 106(a) of the Bankruptcy Code.

None of the Defendants have filed answers directly addressing the allegations contained in the Plan Administrator's complaints. Nor have they filed proofs of claim in the Debtor's main bankruptcy case. Instead, the Defendants each filed a motion to dismiss, and their attorneys subsequently made special appearances before this Court at a joint hearing on those motions. In their motions and at oral argument, each Defendant contested this Court's jurisdiction on grounds that the Eleventh Amendment renders § 106(a) unconstitutional and precludes this Court from proceeding to hear these adversary proceedings on the merits.[4] This Court took the motions under advisement and certified to

---

    (B)   the transfer had not been made; and
    (C)   such creditor received payment of such debt to the extent provided by the
           provisions of this title.
11 U.S.C. § 547(a). None of the exceptions enumerated in other provisions of § 547 are alleged to be applicable in the present cases.
    If the court finds that a debtor has made a preferential transfer, § 550 allows the Plan Administrator to then recover the value of that transfer from the initial transferee. 11 U.S.C. § 550(a).
    Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 7001(1) requires the commencement of an adversary proceeding to determine whether the transfers were preferential under the Code and to recover the value of any such transfer. Fed. R. Bankr. P. 7001(1).

    [4] Under Bankruptcy Rule 7012(b), Federal Rules of Civil Procedure 12(b)-(h) are made applicable to all adversary proceedings. The defendants have brought their motions to dismiss pursuant to Federal Rules 12(b)(1) (lack of jurisdiction over the subject matter) "and/or" 12(b)(2) (lack of jurisdiction over the person), because it is somewhat unclear whether the Eleventh Amendment is more properly characterized as a limitation on subject matter or *in personam* jurisdiction. See New Jersey v. Yeutseun Chen (In re Yeutseun Chen), 227 B.R. 614, 621-22 (D.N.J. 1998) (collecting cases). This Court need not determine the answer to this question in the present case, as Eleventh Amendment jurisprudence controls this Court's analysis, regardless of whether the defense is more properly raised in a 12(b)(1) or 12(b)(2) motion.

4

the United States Attorney General that the constitutionality of an Act of Congress (namely, 11 U.S.C. § 106(a)) was being drawn into question by the present proceedings. [5] The Attorney General having failed to respond and the issues having been fully briefed, this Court now enters its decision.

II.    POSITIONS OF THE PARTIES

Section 106(a) of the Bankruptcy Code provides that "sovereign immunity is abrogated as to a governmental unit" with respect to certain enumerated provisions of the Code; included in those enumerated provisions are §§ 502, 547 and 550. 11 U.S.C. § 106(a)(1) (2005).[6] In support of the constitutionality of § 106(a) with regard to suits brought against the States, the Plan Administrator relies primarily on the reasoning presented by the Sixth Circuit in Hood v. Tennessee Student Assistance Corp. (In re Hood), 319 F.3d

_____

[5] 28 U.S.C. § 2403(a) requires this certification and provides, in relevant part:

In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality . . .

[6] More fully, § 106(a) provides:
(a)  Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
    (1) [Listing various Bankruptcy Code provisions]
    (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.
    (3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages.
    . . . .
11 U.S.C. § 106(a).

755 (6th Cir. 2003), aff'd on other grounds, 541 U.S. 440, 124 S. Ct. 1905, 158 L. Ed. 2d

764 (2004). There, the Sixth Circuit held that States are not immune from suits brought by

estate representatives in the bankruptcy courts, even when a State has not filed a proof

of claim in the main bankruptcy case and has not otherwise voluntarily invoked the

jurisdiction of the bankruptcy court. The Plan Administrator urges this Court to adopt the

Sixth Circuit's analysis and rule that it has jurisdiction over these proceedings because §

106(a) validly abrogates the States' Eleventh Amendment immunity.

First, the Plan Administrator contends, and the Defendants do not disagree, that §

106(a) contains a clear statement of Congress' intent to abrogate the States' sovereign

immunity. Second, the Plan Administrator argues that, as described by the Sixth Circuit in

Hood, the plan of the Constitutional Convention, the Framers' understanding and intent

with regard to the Bankruptcy Clause and the States' ratification of the Constitution altered

the States' general retention of sovereign immunity (as later reaffirmed by the Eleventh

Amendment). Therefore, the Plan Administrator argues, Congress may subject States to

the jurisdiction of the federal bankruptcy courts by the enactment of a proper abrogation

provision.[7]

Even if the States are generally entitled to Eleventh Amendment immunity from

_____

[7] Other courts have also considered whether § 106(a) validly abrogates State sovereign immunity pursuant to the Fourteenth Amendment. While some courts have found that § 106(a) is a valid exercise of congressional power under the Fourteenth Amendment, see, e.g., Wyoming Dep't of Transp. v. Straight (In re Straight), 209 B.R. 540, 555 (D. Wyo. 1997), aff'd on other grounds, 143 F.3d 1387 (10th Cir. 1998), cert. denied, 525 U.S. 982, 119 S. Ct. 446, 142 L. Ed. 2d 400 (1998); Mather v. Oklahoma Empl. Sec. Comm'n (In re Southern Star Foods, Inc.), 190 B.R. 419 (Bankr. E.D. Okla. 1995), some courts have held otherwise, see, e.g., Georgia Higher Educ. Assistance Corp. v. Crow (In re Crow), 394 F.3d 918, 923-24 (11th Cir. 2004) (collecting cases). Because the Plan Administrator has not advanced this argument, this Court expressly declines to address the constitutionality of § 106(a) in light of congressional power under the Fourteenth Amendment.

private suits authorized by bankruptcy legislation, the Plan Administrator urges this Court to adopt a "marketplace participant" exception to Eleventh Amendment immunity in bankruptcy proceedings, as did the Vermont Bankruptcy Court in Flores v. Illinois Department of Public Health (In re Flores), 300 B.R. 599, 608-9 (Bankr. D. Vt. 2003). Such an exception would prevent the States from claiming immunity from suit in bankruptcy courts when the claims arise from the States' voluntary participation in private commercial activities.

Finally, relying on § 502 of the Code,[8] the Plan Administrator asks this Court to disallow payment on any future proof of claim filed by a Defendant who is found to have received a preferential transfer but has failed to turn over the value of such transfer to the Plan Administrator.

The Defendants all maintain that this Court has no jurisdiction to adjudicate these preference actions. First, they argue that there is no exception to Eleventh Amendment immunity based on the States' participation in the private marketplace and that the "marketplace participant" argument was specifically rejected in College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999).

The Defendants also vehemently disagree with the conclusion drawn by the Sixth Circuit in Hood. The Defendants argue that since (1) the Supreme Court ruled in Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996), that

---

[8] § 502 provides, in relevant part:
(d)    . . . [T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . ., unless such entity . . . has paid the amount, or turned over any such property, for which such entity . . . is liable . . . .

7

Congress may not abrogate the States' constitutionally-retained sovereign immunity through the exercise of an Article I power; and (2) congressional authority over bankruptcy matters is granted in Article I, the ability of Congress to abrogate the States' sovereign immunity through § 106(a) has been conclusively foreclosed. Accordingly, they say, this Court must dismiss the instant proceedings for lack of jurisdiction.

Finally, the Defendants maintain that the presumption articulated in Hans v. Louisiana, 134 U.S. 1, 18, 10 S. Ct. 504, 33 L. Ed. 842 (1890), that no "anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution," controls the outcome here. The Defendants argue that, since: (1) federal question jurisdiction did not exist and was not contemplated at the time of the Constitution's ratification; (2) early bankruptcy legislation did not "apply" to the States; and (3) the concept of preference avoidance did not appear until the Bankruptcy Act of 1841, the States could not have ceded their sovereign immunity with respect to the adversary proceedings at issue here.

III.    DISCUSSION

A. The Eleventh Amendment and the Constitutionality of 11 U.S.C. § 106(a)

As an incident of their sovereign status within our federalist framework, the States are generally immune from suits in federal court brought by private individuals. Hans v. Louisiana, 134 U.S. 1, 13, 10 S. Ct. 504, 33 L. Ed. 842 (1890); see also Federal Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S. 743, 751-52, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39, 115 S. Ct. 394, 130 L. Ed. 2d 245 (1994); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105

S. Ct. 3142, 87 L. Ed. 2d 171 (1985) (quoting Ex parte New York, 256 U.S. 490, 497, 41 S. Ct. 588, 65 L. Ed. 1057 (1921))   . The Eleventh Amendment "'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III' of the Constitution." Atascadero, 473 U.S. at 238, 105 S. Ct. 3142 (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 98, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)).

When a defendant raises the Eleventh Amendment as a jurisdictional defense, two preliminary issues must be addressed before considering the impact of the Eleventh Amendment on the proceedings. First, the court must determine whether the named defendant holds the status required to claim Eleventh Amendment immunity. Only a State can claim Eleventh Amendment immunity.  When the State is not directly named as a defendant, the Eleventh Amendment will only apply if the State is the "real, substantial party in interest."[9] Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464, 65 S. Ct. 347, 89 L. Ed. 389 (1945); see also Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974). This requirement is met in the present cases, since the Universities named as defendants are instrumentalities of their respective States and are entitled to immunity from suit to the same extent that the States would be entitled to claim such immunity.[10]

---

[9] As the Supreme Court noted in Dugan v. Rank,
The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'
372 U.S. 609, 620, 83 S. Ct. 999, 10 L. Ed. 2d 15 (1963) (citations omitted).

[10] Although the Plan Administrator raised the question of whether Florida State University and the University of Texas at Austin are entitled to their respective States' immunity, this Court is persuaded by the arguments made in the Defendants' supplemental briefs that

Second, the proceeding must qualify as a "suit" for purposes of the Eleventh

Amendment. Bankruptcy cases are unique in that they contain a number of discrete

disputes – "e.g., adversary proceedings, administrative applications, and contested matters

– within the larger liquidation or reorganization case . . . ." Fleet Data Processing Corp. v.

Branch (In re Bank of New England Corp.), 218 B.R. 643, 647 (1st Cir. B.A.P. 1998). Some

contested matters in bankruptcy are required by the Bankruptcy Rules to be brought as

adversary proceedings, yet are not considered to be "suits" for Eleventh Amendment

purposes.[11] The adversary proceedings at issue in this case, however, clearly implicate the

Eleventh Amendment because they touch upon core concerns of State sovereignty.

The purposes of Eleventh Amendment immunity are (1) to "avoid 'the indignity of

subjecting a State to the coercive process of judicial tribunals at the instance of private

parties'" and (2) to protect the State's treasury. Seminole Tribe of Florida v. Florida, 517

U.S. 44, 58, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) (citing Hess, 513 U.S. at 48,115

S. Ct. 394; Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139,

146, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993)). Since these adversary proceedings not

only required service of process on the Defendants, but also have the potential of requiring

---

they are instrumentalities of their States for purposes of the Eleventh Amendment. As to Florida
State University, see Fla. Const. art. IX, § 7; Fla. Stat. §§ 768.28(1), (2), (18); Byron v. Univ. of
Florida, 403 F. Supp. 49, 51 (N.D. Fla. 1975). As to the University of Texas at Austin, see Tex.
Educ. Code §§ 65.01 et. seq.; Gay Student Servs. v. Texas A & M Univ., 737 F.2d 1317, 1333
(5th Cir. 1984); United Carolina Bank v. Board of Regents of Stephen F. Austin State Univ., 665
F.2d 553 (5th Cir. 1982); Ramos v. Texas Tech Univ., 441 F. Supp. 1050 (N.D. Tex. 1977),
aff'd 566 F.2d 573 (5th Cir. 1978); Hart v. Univ. of Texas at Houston, 474 F. Supp. 465 (S.D.
Tex. 1979).

[11] See, e.g., Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 124 S. Ct.
1905, 158 L. Ed. 2d 764 (2004) (discussed more fully below) (holding that a proceeding to
determine dischargeability of a debt guaranteed by a State entity is not a "suit" for Eleventh
Amendment purposes even though it must be brought by adversary proceeding and requires
service of a summons upon the State).

the Defendants to turn over funds to the Plan Administrator for distribution under the

Bankruptcy Code, they clearly qualify as suits under the Eleventh Amendment. Therefore,

since the Defendants are entitled to claim immunity from this suit to the extent provided for

by the Eleventh Amendment, this Court must determine the scope of that immunity.

As originally drafted, the United States Constitution did not explicitly provide for the

States' immunity from suit by private individuals in federal courts.  See Federal Maritime

Comm'n, 535 U.S. at 752-54, 122 S. Ct. 1864. The Eleventh Amendment, however, was

intended to reaffirm the States' retention of their sovereign immunity and provides:

> The Judicial power of the United States shall not be construed to extend to
> any suit in law or equity, commenced or prosecuted against one of the
> United States by Citizens of another State, or by Citizens or Subjects of any
> Foreign State.[12]

It has been posited that the Eleventh Amendment restricts only the federal courts'

---

[12] The Eleventh Amendment was adopted in reaction to the Supreme Court's decision in
Chisholm v. Georgia, where a majority of the Court held that Georgia could be forced to answer
a suit brought in federal court by a citizen of South Carolina to recover a debt, because Article
III of the Constitution authorized federal jurisdiction over suits "between a State and a citizen of
another State," 2 U.S. (2 Dall.) 419, 450-51, 466-67, 1 L. Ed. 440 (1793).  In swift reaction to
the Chisholm decision, and out of fear that the decision would authorize an onslaught of suits
against the States by private individuals seeking to recover on war debts, Congress proposed,
and the States subsequently ratified, the Eleventh Amendment. As Chief Justice Marshall
explained in Cohens v. Virginia:
> It is a part of our history, that, at the adoption of the constitution, all the States
> were greatly indebted; and the apprehension that these debts might be
> prosecuted in the federal Courts, formed a very serious objection to that
> instrument. Suits were instituted; and the Court maintained its jurisdiction. The
> alarm was general; and, to quiet the apprehensions that were so extensively
> entertained, this amendment was proposed in Congress, and adopted by the
> State legislatures.
19 U.S. (6 Wheat) 264, 406 (1821). See also Hess, 513 U.S. at 39, 115 S. Ct. 394,(quoting
Pennhurst, 465 U.S. at 151, 104 S. Ct. 900 (Stevens, J., dissenting)) ("Adoption of the
[Eleventh] Amendment responded most immediately to the States' fears that 'federal courts
would force them to pay their [ ] War debts . . . .'"); Atascadero, 473 U.S. at 238, 105 S. Ct.
3142.

diversity jurisdiction, and not federal question jurisdiction. [13] See, e.g., Federal Maritime

Comm'n, 535 U.S. at 771, 122 S. Ct. 1864 (Stevens, J., dissenting); Atascadero, 473 U.S.

at 258-302, 105 S. Ct. 3142 (Brennan, J., dissenting). This argument has been rejected

by recent Supreme Court jurisprudence. See, e.g., Board of Trustees v. Garrett, 531 U.S.

356, 363, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001). In fact, the Supreme Court has

"understood the Eleventh Amendment to stand not so much for what it says, but for the

presupposition of our constitutional structure which it confirms." Blatchford v. Native Village

of Noatak, 501 U.S. 775, 779, 111 S. Ct. 2578, 115 L. Ed. 2d 686 (1991);    see also

Seminole Tribe, 517 U.S. at 54, 116 S. Ct. 1114. That "presupposition" is that the States

retain their general sovereign immunity from suit unless that immunity was specifically

altered by the original plan of the Constitution or by dint of a constitutional amendment that

followed the Eleventh.

A broad construction of the Eleventh Amendment was articulated in 1890 by the

Supreme Court in Hans v. Louisiana, where the Court held that the Eleventh Amendment

immunizes the States from suits brought in federal court by one of their own citizens. 134

---

[13] The federal district courts obtain jurisdiction over civil suits in two primary ways. First,
a federal court exercises "diversity jurisdiction" over
[A]ll civil actions in which the matter in controversy exceeds the sum or value of
$75,000 . . . and is between . . .
    (1)  Citizens of different states;
    (2)  Citizens of a state and citizens or subjects of a foreign state;
    (3)  Citizens of different states and in which citizens or subjects of a foreign
        state are additional parties; or
    (4)  A foreign state as plaintiff and citizens of a state or different states.
Moore's Federal Practice § 102.10 (3d ed. 2005); see also 28 U.S.C. § 1332(a)(1)-(4); U.S.
Const. art. III, § 2, cl. 1. Federal courts may exercise diversity jurisdiction, regardless of the
nature of the claims presented, so long as the litigants' citizenship (and amount in controversy)
meet the statutory requirements.
    In contrast, "federal question" jurisdiction is conferred on the district courts, without
regard to the parties' citizenship, over "all civil actions arising under the Constitution, laws, or
treaties of the United States." 28 U.S.C. § 1331; U.S. Const. art. III, § 2, cl. 1.

U.S. 1, 10 S. Ct. 504 (1890). The Eleventh Amendment has subsequently been held to render States immune from certain administrative proceedings, see Federal Maritime Comm'n, 535 U.S. 743, 122 S. Ct. 1864, from suits brought in admiralty, see Ex parte New York, 256 U.S. 490, 41 S. Ct. 588, 65 L. Ed. 1057 (1921), from suits brought in State courts on federal claims, see Alden v. Maine, 527 U.S. 706, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999), and from suits brought by Indian Tribes, see Blatchford, 501 U.S. 775, 111 S. Ct. 2578, or foreign nations, see Principality of Monaco v. Mississippi, 292 U.S. 313, 54 S. Ct. 745, 78 L. Ed. 1282 (1934). This interpretation of the Eleventh Amendment permits suits against the States brought by the United States, United States v. Mississippi, 380 U.S. 128, 140, 85 S. Ct. 808, 13 L. Ed. 2d 717 (1965), or by another State, Maryland v. Louisiana, 451 U.S. 725, 745 n.21, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981).

Congress may also abrogate the States' Eleventh Amendment immunity by creating private rights of action against the States pursuant to a sufficient source of constitutional authority. Seminole Tribe, 517 U.S. at 58, 116 S. Ct. 1114. In Pennsylvania v. Union Gas Co., the Supreme Court held that Congress has the power to abrogate the States' Eleventh Amendment immunity when legislating pursuant to the Interstate Commerce Clause. 491 U.S. 1, 109 S. Ct. 2273, 105 L. Ed. 2d 1 (1989). The Union Gas plurality relied primarily on the "'plenary' grant of authority" given to Congress under the Commerce Clause, 491 U.S. at 17, 109 S. Ct. 2273, and reasoned that:

> because the congressional power thus conferred would be incomplete without the authority to render States liable in damages, it must be that, to the extent that the States gave Congress the authority to regulate commerce, they also relinquished their immunity where Congress found it necessary, in exercising this authority, to render them liable.

Id. at 19-20, 109 S. Ct. 2273.

13

In Seminole Tribe of Florida v. Florida, however, the Supreme Court expressly overruled Union Gas and held that Congress does not have the power to abrogate State sovereign immunity when acting pursuant to either the Indian Commerce Clause or the Interstate Commerce Clause.[14] 517 U.S. at 67, 72, 116 S. Ct. 1114. The Seminole Tribe majority rejected the Union Gas reasoning, ruling instead that the Eleventh Amendment reaffirms the basic constitutional presumption, existing at the time of Constitutional ratification, that "[u]nless . . . there is a surrender of [sovereign] immunity *in the plan of the [constitutional] convention*, it will remain with the States . . . ." Id. at 70 n.13, 116 S. Ct. 1114 (quoting The Federalist No. 81 (Alexander Hamilton)) (emphasis added), and "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." Seminole Tribe, 517 U.S. at 73, 116 S. Ct. 1114[15]

Given Seminole Tribe and the Supreme Court's repeated admonition to look beyond the text of the Eleventh Amendment to the original understanding of the States' immunity from suit at the time of the Constitution's ratification, the issue is thus: whether Congress may create private rights of action against the States when acting pursuant to Article I,

---

[14] These powers are enumerated in Article I, section 8, clause 3, which provides that Congress shall have Power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

[15] The Seminole Tribe Court noted that the Fourteenth Amendment remains a valid source of congressional power to abrogate State immunity in federal courts. 517 U.S. at 65-66, 116 S. Ct. 1114. See also Garrett, 531 U.S. at 363, 121 S. Ct. 955; Atascadero, 473 U.S. at 238, 105 S. Ct. 3142; Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976) ("the Eleventh Amendment, and the principle of State sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.") (citations omitted). Because the Fourteenth Amendment was ratified *after* the Eleventh Amendment, when the States gave Congress the power "to enforce, by appropriate legislation," the substantive guarantees of the Fourteenth Amendment, the States accepted the possibility that Congress may choose to enforce such legislation directly against the States in federal courts. Seminole Tribe, 517 U.S. at 65-66, 116 S. Ct. 1114.

section 8, clause 4 of the Constitution - the bankruptcy power.

Generally, when a court is called to consider whether a specific piece of congressional legislation validly abrogates the States' Eleventh Amendment immunity, the court must determine: (1) whether there is "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States,'" Pennhurst, 465 U.S. at 99, 104 S. Ct. 900 (quoting Quern v. Jordan, 440 U.S. 332, 342, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979)); see also Seminole Tribe, 517 U.S. at 55, 116 S. Ct. 1114 (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985)); Atascadero, 473 U.S. at 240, 243 n.3, 105 S. Ct. 3142, and (2) "whether Congress has acted 'pursuant to a valid exercise of power.'" Seminole Tribe, 517 U.S. at 55, 116 S. Ct. 1114 (quoting Green v. Mansour, 474 U.S. at 68, 106 S. Ct. 423). Section 106(a) is undisputedly a clear statement of congressional intent to abrogate State sovereign immunity with respect to particular provisions of the Bankruptcy Code.[16]

Seminole Tribe, however, teaches that Article I powers cannot alter the States' basic constitutional sovereignty. Seminole Tribe, 517 U.S. at 72-73, 116 S. Ct. 1114,  Thus, if abrogation would be necessary in order to authorize private suits against the States, then an abrogation provision passed pursuant to an Article I power is ineffective against a valid assertion of Eleventh Amendment immunity. If, however, the States' sovereign immunity with respect to congressional action under a particular Article I power *was* altered by the

---

[16] See Hood v. Tennessee Student Assistance Corp. (In re Hood), 319 F.3d 755, 762 (6th Cir. 2003), aff'd on other grounds, 541 U.S. 440, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004); Sacred Heart Hosp. of Norristown v. Pennsylvania (In re Sacred Heart Hosp. of Norristown), 133 F.3d 237, 243 (3d Cir. 1997); Schlossberg v. Maryland (In re Creative Goldsmiths), 119 F.3d 1140, 1145-46 (4th Cir. 1997), cert. denied, 523 U.S. 1075, 118 S. Ct. 1517, 140 L. Ed. 2d 670 (1998); Straight v. Wyoming Dep't of Transp. (In re Straight), 248 B.R. 403, 415-16 (10th Cir. B.A.P. 2000).

original plan of the Constitution, Congress has the ability to create private causes of action

in federal courts pursuant to that power and *abrogation* is unnecessary. This is so because

> if the Constitution itself contemplated the abrogation of sovereign immunity
> in a particular area, the Eleventh Amendment does not act to restore the
> states to their pre-ratification sovereign status. A state's ratification of the
> Constitution or admission into the Union on an "equal footing" with the other
> states resulted in a surrender by the states of certain pre-existing rights, . .
> . a "surrender of [sovereign] immunity in the plan of the convention."

Nelson v. La Crosse County Dist. Attorney (In re Nelson), 254 B.R. 436, 443 (Bankr. W.D.

Wis. 2000), rev'd, 258 B.R. 374 (W.D. Wis. 2001), reversal aff'd, 301 F.3d 820 (7th Cir.

2002) (citing Seminole Tribe, 517 U.S. at 90 n.13, 116 S. Ct. 1114; Bliemeister v. Industrial

Comm'n (In re Bliemeister), 251 B.R. 383 (Bankr. D. Ariz. 2000), aff'd on other grounds,

296 F.3d 858 (9th Cir. 2002)).[17]

Confronted with the same issues, some courts have focused their inquiry solely on

whether § 106(a) constitutionally abrogates State sovereign immunity. Relying on the

general statement in Seminole that "Article I cannot be used to circumvent the

constitutional limitations placed upon federal jurisdiction," 517 U.S. at 73, 116 S. Ct. 1114,

several Circuits have concluded that the Bankruptcy Clause, because it is found in Article

I, cannot be used to abrogate States' Eleventh Amendment immunity. See, e.g., Georgia

Higher Educ. Assistance Corp. v. Crow (In re Crow), 394 F.3d 918, 921 (11th Cir. 2004);

Nelson v. La Crosse County Dist. Attorney (In re Nelson), 301 F.3d 820, 832 (7th Cir.

2002); Mitchell v. Franchise Tax Bd. (In re Mitchell), 209 F.3d 1111, 1121 (9th Cir. 2000);

---

[17] This analysis does not render § 106(a) superfluous or violate the general principle that
statutes should be interpreted to give meaning to each statutory provision. Regardless of its
relevance to the States, § 106(a) is necessary in order to abrogate the sovereign immunity of
the United States with regard to the specifically named Code provisions. See United States v.
Nordic Village, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (requiring an
unequivocal expression of congressional intent to abrogate the sovereign immunity of the
United States).

In re Sacred Heart Hosp., 133 F.3d at 245; Dep't of Trans. & Dev. v. PNL Asset Mgmt. Co.

(In re Estate of Fernandez),130 F.3d 1138, 1139 (5th Cir. 1997), amending 123 F.3d 241

(5th Cir. 1997); In re Creative Goldsmiths, 119 F.3d at 1145-46 (4th Cir. 1997).[18] Some of

these courts have also been very much influenced by a footnote within the majority's

decision in Seminole Tribe.[19]

---

[18] The First Circuit Court of Appeals has not addressed the constitutionality of § 106(a), nor has it decided the question of whether the States ceded their sovereign immunity with respect to bankruptcy matters. In Arecibo Community Health Care, Inc. v. Puerto Rico, 244 F.3d 241 (1st Circuit 2001) ("Arecibo I"), the court considered the constitutionality of § 106(b), which provides that filing of a proof of claim is deemed to waive sovereign immunity with respect to any claims arising from the same transaction or occurrence, see 11 U.S.C. § 106(b), and found § 106(b) to be unconstitutional on grounds that it attempted to create an invalid "constructive waiver" of the States' immunity. Id. at 245. The United States and the chapter 7 trustee moved for rehearing; the panel granted the motion and reheard the case. On rehearing, the court vacated its earlier decision and found that it had "misinterpreted recent Supreme Court precedent." Arecibo Community Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 20 (1st Cir. 2001) ("Arecibo II"). The court held that § 106(b) is not unconstitutional, because that provision merely embodies the long-accepted principle that, by filing a proof of claim, a State waives its immunity with respect to that claim. Id. at 26-27. In both opinions, the court noted that the parties did not appeal the lower courts' ruling that § 106(a) was unconstitutional. Arecibo I, 244 F.3d at 244 n.2; Arecibo II, 270 F.3d at 21 n.4.

In Gosselin v. Mass. Dep't of Revenue (In re Gosselin), 276 F.3d 70 (1st Cir. 2002), the First Circuit again refused to consider the constitutionality of § 106(a) when given an opportunity to do so. Although the District Court found that the Eleventh Amendment barred a debtor's adversary proceeding against the State, the First Circuit declined to affirm on that ground. Id. Instead, since the debtor's only argument – that the State had waived its immunity – was raised for the first time on appeal, the First Circuit affirmed the decision below, but "[did] not adopt the district court's reasoning." Id. at 72.

[19] See, e.g., In re Nelson, 301 F.3d at 830; In re Fernandez, 123 F.3d at 244. In footnote 16 in the Seminole Tribe decision, the Court stated that "it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded relief against a State under any of those statutory schemes . . . . Although the copyright and bankruptcy laws have existed practically since our Nation's inception, . . . there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States." 517 U.S. at 72 n.16, 116 S. Ct. 1114. This footnote was meant to respond to the dissent's concerns that the majority decision would "prevent[ ] Congress from providing a federal forum for a broad range of actions against States . . . concerning bankruptcy," id. at 77, 116 S. Ct. 1114, and would "suggest[ ] that persons harmed by State violations of federal copyright, bankruptcy, and antitrust laws have no remedy." Id. at 77 n.1, 116 S. Ct. 1114.

Subsequent analysis by various courts and commentators has demonstrated that the majority may have been a bit hasty in making this response, at least with regard to the

17

This interpretation of <u>Seminole Tribe</u> is not warranted given settled constitutional law and given the Supreme Court's recent holding in <u>Tennessee Student Assistance Corp. v. Hood</u>, 541 U.S. 440, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004) ("<u>TSAC v. Hood</u>").[20] First, it is axiomatic that Congressional legislation carries a presumption of constitutionality, <u>Regan v. Time, Inc.</u>, 468 U.S. 641, 652, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1983); <u>Rostker v. Goldberg</u>, 453 U.S. 57, 64, 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981); <u>Usery v. Turner Elkhorn Mining Co.</u>, 428 U.S. 1, 15, 96 S. Ct. 2882, 49 L. Ed. 2d 752 (1976); <u>United States v. National Dairy Prods. Corp.</u>, 372 U.S. 29, 32, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963); <u>Williamson v. Lee Optical</u>, 348 U.S. 483, 487-88, 75 S. Ct. 461, 99 L. Ed. 563 (1955). Second, the footnote reference in <u>Seminole Tribe</u> to bankruptcy is more properly characterized as *dicta*, since <u>Seminole Tribe</u> did not address the Eleventh Amendment in light of the Bankruptcy Clause, see <u>Lees v. Tennessee Student Assistance Corp. (In re</u>

---

enforcement of bankruptcy laws against the States. Many lower courts have noted that States are quite frequently participants in the bankruptcy process and the lower federal courts have, of necessity, enforced the provisions of the Bankruptcy Code against the States. <u>See, e.g.</u>, <u>In re Lees</u>, 252 B.R. 441 ("State governmental units are among the largest creditors who appear in the bankruptcy courts.") (citing <u>State Bankruptcy Survey Results</u>, Bankr. Ct. Dec., Weekly News and Comment, at p. A1 (Nov. 19, 1996)); <u>Schulman v. California State Water Resources Control Bd. (In re Lazar)</u>, 200 B.R. 358, 376 (Bankr. C.D. Cal. 1996) ("As a factual matter, . . . Justice Rehnquist was simply wrong . . . [T]here is a longstanding tradition in the bankruptcy courts . . . of allowing the bankruptcy courts to enforce applicable law against the states."). The Supreme Court also has an established tradition of enforcing federal bankruptcy legislation against the States. <u>See, e.g.</u>, <u>TSAC. v. Hood</u>, 541 U.S. 440, 124 S. Ct. 1905 (State agency bound by bankruptcy court's student loan dischargeability determination brought by adversary proceeding); <u>Gardner v. New Jersey</u>, 329 U.S. 565, 67 S. Ct. 467, 91 L. Ed. 504 (1947) (bankruptcy court may adjudicate issues related to State tax liens); <u>New York v. Irving Trust Co.</u>, 288 U.S. 329, 53 S. Ct. 389, 77 L. Ed. 815 (1933) (State must file claim within time provided by bankruptcy laws); <u>New Jersey v. Anderson</u>, 203 U.S. 483, 27 S. Ct. 137, 51 L. Ed. 284 (1906) (determination of what constitutes a tax is controlled by federal bankruptcy law).

[20] Because this opinion will address both the Supreme Court opinion in <u>Tennessee Student Assistance Corp. v. Hood</u>, 541 U.S. 440, 124 S. Ct. 1905, and the Sixth Circuit's analysis in <u>Hood v. Tennessee Student Assistance Corp. (In re Hood)</u>, 319 F.3d 755 (6th Cir. 2003), the Supreme Court opinion will hereafter be referred to as "<u>TSAC v. Hood</u>" and the Sixth Circuit opinion as "<u>Hood</u>."

Lees), 252 B.R. 441 (Bankr. W.D. Tenn. 2000), and "does not constitute binding precedent." Id. (noting that "[t]he dicta in *Seminole Tribe* is subject to revisitation in a new context") (citing Colgrove v. Battin, 413 U.S. 149, 157, 93 S. Ct. 2448, 37 L. Ed. 2d 522 (1973) (Supreme Court "declin[ed] to follow dicta stating that the 7th Amendment requires a jury of 12 persons in civil trials"); United States v. DiFrancesco, 449 U.S. 117, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980)).

Finally, despite the Defendants' contention that the Supreme Court's opinion in TSAC v. Hood supports their position, this Court concludes otherwise.[21] Although the Supreme Court granted certiorari "to determine whether [the Bankruptcy] Clause grants Congress the authority to abrogate State sovereign immunity from private suits," TSAC v. Hood, 541 U.S. at 443, 124 S. Ct. 1905, the Court ultimately declined to reach that issue, ruling instead that the proceeding in question did not implicate the Eleventh Amendment.[22]

The Defendants correctly note that the Court explicitly distinguished the

---

[21] TSAC v. Hood arose from an adversary proceeding filed against State entity TSAC by a chapter 7 debtor seeking a § 523(a)(8) discharge of student loans assigned to TSAC. 541 U.S. at 443-44, 124 S. Ct. 1905. Because the Bankruptcy Rules require § 523(a)(8) dischargeability determinations to be brought by adversary proceeding, TSAC claimed Eleventh Amendment immunity from the proceeding. Id. Although the lower courts all found for the debtor on grounds that the States did not retain sovereign immunity with respect to bankruptcy proceedings, id., the Supreme Court found instead that the proceeding did not implicate the Eleventh Amendment. Id. at 453-54, 124 S. Ct. 1905. Ruling that the dischargeability of a debt falls squarely within the bankruptcy court's *in rem* jurisdiction, the majority characterized the issuance of process required under the Bankruptcy Rules as functionally equivalent to the filing of a motion by the debtor, which filing would not encroach upon the States' sovereignty. Id. Since the bankruptcy court was merely exercising *in rem*, as opposed to *in personam*, jurisdiction over the State, the majority found the Eleventh Amendment question to be irrelevant. Id.

[22] See, e.g., TSAC v. Hood, 541 U.S. at 454, 124 S. Ct. 1905 ("We therefore decline to decide whether a bankruptcy court's exercise of personal jurisdiction over a State would be valid under the Eleventh Amendment."); id. at 452 ("In this case, however, there is no need to engage in a comparative analysis to determine whether the adjudication would be an affront to States' sovereignty.").

19

dischargeability proceeding in TSAC v. Hood from an adversary proceeding brought to

recover a voidable preference. 541 U.S. at 454, 124 S. Ct. 1905. It is too far a stretch,

however, to conclude that the Court meant to imply that a dischargeability proceeding

involving a State is constitutionally permissible, while a preference action is not. Rather,

the Court's purpose in distinguishing the two proceedings was merely to emphasize that

a dischargeability determination is not a "suit" that implicates the Eleventh Amendment,

while an adversary proceeding to recover a preference probably *would* constitute a suit

under the Eleventh Amendment. See id. Because the Supreme Court did not decide the

issue presented in this case,[23] this Court must undertake the constitutional analysis

required by Seminole Tribe.

Although it may be generally true that Congress cannot authorize private suits

against the States pursuant to its Article I powers, the question of whether the plan of the

Constitutional convention and intent of the Framers resulted in the retention or alienation

of State sovereign immunity with regard to a *particular* Article I power requires a more

thorough inquiry. A cursory analysis does injustice to the holding of Seminole Tribe and

previous Supreme Court precedent, where the Court has repeatedly noted that the *plan*

*of the constitutional convention* remains the sole source of Congressional authority to

authorize private suits against the States under the Article I powers. The Court in Seminole

---

[23] This Court is aware that the Supreme Court has recently granted certiorari in a case posing issues very similar to those presented here. See Central Virginia Community College v. Katz, 125 S. Ct. 1727, 161 L. Ed. 2d 601 (2005), granting cert. to Katz v. Central Virginia Community College (In re Wallace's Bookstore), 106 Fed. Appx. 341 (6th Cir. 2004). Because the Sixth Circuit, in an unpublished opinion, affirmed the jurisdiction of the bankruptcy court over an adversary proceeding commenced against a State entity to avoid and recover preferential transfers solely on the authority of Hood, the issue presented in Katz directly implicates the Hood analysis. In its petition for certiorari, the State of Virginia presented the question as whether "Congress may use the Article I Bankruptcy Clause . . . to abrogate the States' sovereign immunity." Brief for Petitioner, 2004 WL 3017740 (U.S.), 73 USLW 3401.

<u>Tribe</u> closely examined The Federalist Papers and relied on the Framers' original understanding of Constitutional text and structure to reach its holding. 517 U.S. at 69-71, 116 S. Ct. 1114. Similar questions require similar analyses. *That* is the lesson of <u>Seminole Tribe</u>.

B. Sovereign immunity and the Bankruptcy Power

    1. Ratification of the Constitution

    The United States Constitution grants Congress the power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Discerning the Framers' original intent and understanding regarding this clause is somewhat difficult given the paucity of recorded debate on the subject of bankruptcy during the Constitutional convention.

    The first reference to bankruptcy appeared relatively late in the convention. "On August 29 [1787], Charles Pinkney of South Carolina moved to commit the Full Faith and Credit Clause . . . with an addition 'to establish uniform laws upon the subject of bankruptcies and respecting the damages arising on the protest of foreign bills of exchange.'" Charles Warren, <u>Bankruptcy in United States History</u> 4 (1935).[24] The

---

[24] This proposal followed "discussion on the Convention floor of whether a State insolvency act should be treated like a State court judgment." Frank R. Kennedy, "Bankruptcy and the Constitution" 132, <u>in Blessings of Liberty: The Constitution and the Practice of Law</u> 131-74 (The American Law Institute 1988).

    As discussed at length in Kurt H. Nadelmann, <u>On the Origin of the Bankruptcy Clause</u>, 1 Am. J. Legal Hist. 215 (1957), it is not surprising that the topic of bankruptcy arose during a discussion on the Full Faith and Credit Clause, which in its current form reads:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. Const. art. IV, § 1. Given the wide variation in extant State insolvency laws, one of the "great question[s]" of the time was "whether action in one state could protect the debtor if he

Bankruptcy Clause in its current form was proposed on September 1, 1787 as an addition to the legislative powers granted under Article I, to be "added after the power 'to establish an uniform rule of naturalization throughout the United States.'" Nadelmann, Origin of the Bankruptcy Clause, at 216 (quoting 2 Max Farrand, The Records of the Federal Convention of 1787 483 n.4 (1911)). The Bankruptcy Clause was then "adopted with practically no debate."[25] Id.

Therefore, in looking to the convention debates alone, this Court can discern no clear intent of the Framers regarding the retention or alteration of the States' sovereign immunity with respect to the bankruptcy power.

### 2. The Federalist Papers[26]

The Supreme Court has often relied upon The Federalist papers to discern meaning

---

ventured into another state." Nadelmann, Origin of the Bankruptcy Clause, at 224.

[25] The lone dissenter was Robert Sherman of Connecticut, who objected to the Bankruptcy Clause on the grounds that it would give Congress the power to provide for capital punishment for bankruptcy offenses, as was permitted at various times by English law. Nadelmann, Origin of the Bankruptcy Clause, at 217; 2 Farrand, Records of the Convention, at 489, n.4.

[26] The Federalist papers were born out of the controversy that erupted when the proposed Constitution was presented to the States for ratification.

> To influence the result in the important state of New York, three prominent supporters of the Constitution undertook to write a series of newspaper articles explaining and supporting its underlying principles. The authors were among the paragons of an extraordinary generation: Alexander Hamilton, . . . James Madison, . . . [and] John Jay. . . . [T]heir essays, first published under the pseudonym "Publius" and later collected as The Federalist, constituted a trenchant defense of a cautious form of republicanism in a tradition of political writing that descended from the ancients. In sum, The Federalist represents the classic explanation and defense of the Constitution in its original form.

Peter E. Quint, The Federalist Papers and the Constitution of the United States, 77 Ky. L. J. 369, 371-72 (1989).

and intent at the time of the Constitution's drafting and ratification.[27] Printz v. United States, 521 U.S. 898, 910, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997) (describing the Federalist papers as a source the Court has "usually regarded as indicative of the original understanding of the Constitution."); see also Federal Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S. 743, 751-52, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Alden v. Maine, 527 U.S. 706, 755, 119 S. Ct. 2240, 144 L. Ed. 2d 636; Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 70 n.13, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.2, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985); Edelman v. Jordan, 415 U.S. 651, 660-63, 660 n.9, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Principality of Monaco v. Mississippi, 292 U.S. 313, 323-25, 54 S. Ct. 745, 78 L. Ed. 1282 (1934).

Given the Supreme Court's traditional reliance on The Federalist papers to understand Constitutional principles, and the Court's repeated admonition to look to the plan of the convention to determine whether the sovereign immunity of States has been altered by particular Constitutional provisions, this Court finds the approach taken by the Sixth Circuit in Hood v. Tennessee Student Assistance Corp. (In re Hood), 319 F.3d 755 (6th Cir. 2003), to be the proper one. In Hood, the Sixth Circuit looked closely at the Federalist papers to discern the original intent and understanding with regard to the Bankruptcy Clause at the time of the Constitution's drafting and ratification. Id. at 759-67; see also  Smith v. Goode (In re Smith), 301 B.R. 96 (Bankr. M.D. Ga. 2003); In re Bliemeister, 251 B.R. 383 (Bankr. D. Ariz. 2000).

---

[27] An empirical analysis of the Supreme Court's reliance on and citation of The Federalist papers can be found in Ira C. Lupu, The Most-Cited Federalist Papers, 15 Const. Comment. 403 (1998).

Bankruptcy is specifically addressed only once in The Federalist papers. In discussing the necessity of vesting certain powers in the federal Congress, James Madison says of bankruptcy that:

> [t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.

The Federalist No. 42, at 308 (Madison) (Benjamin F. Wright ed., 1996). This passage conveys the Framers' conviction that uniform bankruptcy laws were necessary to a national economy and to protect creditors. It says little, however, on the subject of sovereignty.

As the Sixth Circuit noted in Hood, other Federalist papers contain discussions of the States' sovereignty as affected by the grant of certain enumerated powers to the federal government. 319 F.3d at 759. In The Federalist No. 81, Alexander Hamilton affirmed the States' retention of sovereignty in the Constitution's federalist system. The Federalist No. 81, at 511. The Federalist No. 81 is primarily focused on the general structure and jurisdiction of the federal courts. Diverging to address concerns that the proposed Constitution would give the federal courts jurisdiction over private suits brought against the States to recover on war debts,      Hamilton noted that those fears were unfounded, as nothing in the proposed Constitution purported to vest such a power in the federal judiciary. Id.; see also Randolph J. Haines, The Uniformity Power: Why Bankruptcy is Different, 77 Am. Bankr. L.J. 129, 139 (2003). It is here that we find Hamilton's oft-quoted statement:

> It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. . . . Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States . . . .

24

The Federalist No. 81, at 511.[28]

As further support for the proposition that suits against States on war debts would remain barred by the sovereignty retained by the States, Hamilton explained that the rare instances where State sovereignty from suit would be alienated by the Constitution "were discussed in considering the article of taxation." The Federalist No. 81, at 511. The discussion on the article of taxation referred to is The Federalist No. 32. Hood, 319 F.3d at 766; In re Bliemeister, 251 B.R. at 389. There, Hamilton described how alienation of States' sovereign immunity is demarcated *in the text of the Constitution itself* with "the most pointed care." The Federalist No. 32, at 244.[29] One instance where the proposed Constitution would alienate State sovereignty was where "[the Constitution] granted an authority to the Union, to which a similar authority in the States would be absolutely and totally contradictory and repugnant." The Federalist No. 32, at 241. And, as an example of such authority, Hamilton offered the proposed uniform powers with respect to naturalization. Id.

Therefore, it is clear from The Federalist Nos. 32 and 81 that the Constitution's drafters intended the grant of power over naturalization to completely alienate the States'

_____

[28] For a more detailed discussion of the "active debate" regarding "[t]he right of the Federal Judiciary to summon a State as defendant and to adjudicate its rights and liabilities," see Edelman, 415 U.S. at 660 n.9, 660-63, 94 S. Ct. 1347.

[29] As explained by Judge Haines, Hamilton emphasized that the Framers had "used the 'most pointed care' . . . to expressly alienate states' sovereign immunity" because:
> [the] textual requirement was critical . . . . First, it was essential so that the People could identify, at the time of ratification, precisely those areas where sovereign immunity was to be abrogated . . . Second, it was an essential requirement so that it was the sovereign . . . who accomplished the abrogation by ratifying the Plan of the Convention, rather than either Congress or the Court by subsequent conclusions about the relative exclusivity of any particular Article I power.

Haines, The Uniformity Power, at 139 (quoting The Federalist No. 32, at 154 (Hamilton)).

25

sovereign immunity with respect to naturalization matters. Hood, 319 F.3d at 766; In re

Bliemeister, 251 B.R. at 389-90. The Naturalization Clause, found in Article I, section 8,

clause 4 of the Constitution, provides: "[The Congress shall have Power] To establish an

uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies

throughout the United States." U.S. Const. art. I, § 8, cl. 4 (emphasis added). No other

constitutional clause grants Congress the power to create uniform laws or a uniform law

on any other subject.[30] Given the structure of the Constitution and the Framers' decision

to use the word "uniform" in both cases, it appears that the Framers intended to treat the

powers given to Congress over naturalization and bankruptcy as identical in scope. Hood,

319 F.3d at 766; In re Bliemeister, 251 B.R. at 389-90. Since the Framers' express intent

was to alienate State sovereign immunity from suit when Congress exercises its power

over naturalization, it must be deduced that the Framers intended to alienate States'

sovereign immunity with respect to the bankruptcy power as well.[31] Hood, 319 F.3d at 766;

---

[30] The use of the word "uniform" is found in only one other place in the Constitution. In Article I, section 8, clause 1, Congress is granted the "Power To lay and collect Taxes, Duties, Imposts and Excises, . . . but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1 (emphasis added). As noted by Judge Haines, the use of the term "uniform" in the Taxing Power is distinctly different in structure and meaning from its use in the Naturalization and Bankruptcy Clauses. Haines, The Uniformity Power, at 167.

[31] Some courts have suggested that the Hood analysis is flawed, because the States merely ceded their ability to legislate in bankruptcy matters by ratifying the Constitution. See, e.g., Nelson v. La Crosse County District Attorney (In re Nelson), 301 F.3d 820, 834 (7th Cir. 2002). This Court agrees with the Sixth Circuit that the States ceded "their immunity from suit along with their power to legislate together when the states agreed to the Bankruptcy Clause's uniformity provision." Hood, 319 F.3d at 765. This is not to say that the States have impliedly ceded their immunity in every instance where the States have little or no legislative powers. But with regard to bankruptcy,

[The Federalist] No. 32 does in fact refer to the ceding of sovereign immunity. Hamilton's cross-reference to [No. 32] in No. 81's discussion of ceding sovereign immunity can only suggest that, in the minds of the Framers, ceding sovereignty by the methods described in No. 32 implies ceding sovereign immunity as discussed in No. 81. There is no other explanation for his cross-reference in No.

In re Bliemeister, 251 B.R. 389-90.[32]

3. The Power to Establish Uniform Laws on the Subject of Bankruptcies

Relying on Justice Marshall's dissenting opinion in Hoffman v. Connecticut

Department of Income Maintenance, 492 U.S. 96, 111, 109 S. Ct. 2818, 106 L. Ed. 2d 76

(1989), some Courts have rejected the holding in Hood because they find that "there is .

. . no principled basis to distinguish the Bankruptcy Clause from other Article I clauses."

Sacred Heart, 133 F.3d at 243; see also In re Fernandez, 123 F.3d at 244; In re Creative

Goldsmiths, 119 F.3d at 1145-46.[33] Such reasoning, however, mischaracterizes the nature

_____

81.
Id. at 766.

[32] Although the Plan Administrator relies on the Sixth Circuit's analysis in Hood for the proposition that the plan of the convention and text of the Constitution granted Congress the power to *abrogate* State sovereign immunity when acting pursuant to the bankruptcy power, as other courts and commentators have noted, the more correct conclusion to be drawn from The Federalist Papers and the Constitutional text is that State sovereignty was actually *altered* by the ratification of the Constitution. Thus, there was no sovereign immunity from suit left to abrogate. See In re Bliemeister, 251 B.R. at 391-92; Haines, The Uniformity Power, at 141.

[33] Justice Marshall's dissent in Hoffman is an ironic choice to support a finding that Congress does not have the power to authorize suits against the States under the Bankruptcy Clause. Although the passage often cited seems to support that position ("I see no reason to treat Congress' power under the Bankruptcy Clause any differently [than power under the Commerce Clause], for both constitutional provisions give Congress plenary power over national economic activity," Hoffman, 492 U.S. at 111, 109 S. Ct. 2818), in context it is clear that Justice Marshall's dissent advocated a fundamentally different view of the congressional bankruptcy power. Justice Marshall wrote his dissent because he believed Congress *did* have the power under the Bankruptcy Clause to abrogate the States' sovereign immunity. Because Union Gas had not yet been overturned, Justice Marshall's assertion that the scope of power under both clauses was identical was an attempt to demonstrate that "there was no reason to think that the Bankruptcy Clause gave Congress *less* power [than the Commerce Clause]. He had no reason to consider whether it gave Congress *more* power." Hood, 319 F.3d at 763 (citation omitted). Furthermore, Justice Marshall's analysis was certainly not indisputable at the time it was written. See, e.g., 1 Collier on Bankruptcy p. 0.02, at 5 (14th ed. 1974):

[T]he grant of the bankruptcy power in its final form, although related to commerce, was not included in clause 3, which gives to Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Tribes."' From that it is fair to infer that the draftsmen did not wish to restrict the bankruptcy grant as they had done the power over commerce.

27

of the Sixth Circuit's analysis. It is not the plenary nature of congressional power over bankruptcy matters that leads this Court to conclude that State sovereign immunity was altered by the Bankruptcy Clause. Rather, this Court's finding is compelled by the text and structure of the Constitution as elucidated by Hamilton in The Federalist papers. It is therefore inapposite whether this Court believes the extent of congressional legislative power under the Bankruptcy Clause to be similar to congressional power under the Interstate or Indian Commerce Clauses, because it is clear from Hamilton's discussion that the inclusion of the "uniformity" provision *signals* the States' abrogation. In this sense, the Bankruptcy Clause *is* different. See generally, Haines, The Uniformity Power, 77 Am. Bankr. L.J. 129.

Furthermore, an analysis of the meaning of "uniformity" in the bankruptcy context supports this Court's finding that the Framers intended that the States would cede their sovereign immunity in bankruptcy matters by ratifying the Bankruptcy Clause. As Chief Justice Marshall stated in one of the first Supreme Court decisions to consider the scope of congressional power under the Bankruptcy Clause:

> The peculiar terms of the grant [in the Bankruptcy Clause] certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but *to establish uniform laws on the subject throughout the United States.*

Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 193-94, 4 L. Ed. 529 (1819) (emphasis added). The unique terms of the grant *do*, indeed, deserve more attention.

As Justice Marshall's statement in Sturges implies, the use of the word "uniform" in the Bankruptcy Clause was not primarily intended as a restriction on congressional power,

---

Congress was to have an all-inclusive power, through the bankruptcy grant, to enact any legislation reasonably framed and related to the subject of bankruptcies, which in turn is indissolubly linked to commerce and credit.

28

but as a *grant* of power to Congress. The very structure of the clause and its placement

in the Constitution clarify this point. In <u>McCulloch v. Maryland</u>, Justice Marshall made two

cogent points on constitutional text and structure regarding the Necessary and Proper

Clause which are remarkably relevant to the Bankruptcy Clause:

> 1st. The clause is placed among the powers of Congress, not among the limitations on those powers. 2nd. Its terms purport to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted. . . . Had the intention been to make this clause restrictive, it would unquestionably have been so in form as well as in effect.

17 U.S. (4 Wheat.) 316, 419-420, 4 L. Ed. 579 (1819).

The Bankruptcy Clause appears in Article I, among the powers of Congress. And,

as previously noted, the Framers took care to *limit* congressional power by a uniformity

requirement when that meaning was intended. The Taxing Power reflects this purposeful

drafting, by granting Congress the "Power To lay and collect Taxes, Duties, Imposts and

Excises, . . . but all Duties, Imposts and Excises *shall be uniform* throughout the United

States." U.S. Const. art. I, § 8, cl. 1 (emphasis added). This placement of the uniformity

requirement in a restrictive clause contrasts starkly with the grant of "power to establish .

. . uniform laws" found in Article 1, § 8, cl. 4.

The Framers' intent to grant Congress an affirmative power to establish uniform

bankruptcy legislation was noted in <u>Lathrop v. Drake</u>, 91 U.S. (1 Otto) 516, 23 L. Ed. 414

(1876). In holding that the federal bankruptcy courts had jurisdiction to hear matters related

to bankruptcy proceedings pending in other federal districts, the Supreme Court reasoned

that:

> Proceedings ancillary to and in aid of the proceedings in bankruptcy may be necessary in other districts where the principal court cannot exercise jurisdiction; and it may be necessary for the assignee to institute suits in

29

other districts for the recovery of assets of the bankrupt. . . . The State courts
may undoubtedly be resorted to in cases of ordinary suits for the possession
of property or the collection of debts. . . . *But a uniform system of bankruptcy,
national in its character, ought to be capable of execution in the national
tribunals, without dependence upon those of the States. . . .* [T]he several
district courts have jurisdiction of suits brought by assignees appointed by
other district courts in cases of bankruptcy.

<u>Id.</u> at 518 (emphasis added). This holding demonstrates that the uniformity provision has

meaning beyond the mere ability to pass geographically uniform laws; it also grants

Congress the power to *provide for the uniform administration* of those laws.[34] Therefore,

---

[34] Some courts, relying on Justice Frankfurter's concurrence in <u>Vanston Bondholders
Protective Committee v. Green</u>, 329 U.S. 156, 172, 67 S. Ct. 237, 91 L. Ed. 162 (1946) ("[t]he
Constitutional requirement of uniformity is a requirement of geographic uniformity alone"), have
stated that "[b]ecause Eleventh Amendment immunity applies uniformly to all states and to all
parties in a bankruptcy proceeding, the uniformity requirement is not frustrated." <u>In re Sacred
Heart</u>, 133 F.3d at 233; <u>see also</u> <u>In re Fernandez</u>, 123 F.3d at 244. In fact, an overview of the
Supreme Court's jurisprudence regarding the Bankruptcy Clause does not support the
conclusion that "uniformity" in bankruptcy refers to geographic uniformity alone. <u>See, generally</u>,
Judith Schenk Koffler, <u>The Bankruptcy Clause and Exemption Laws: A Reexamination of the
Doctrine of Geographical Uniformity</u>, 58 N.Y.U.L. Rev. 22 (1983) (extensive review of Supreme
Court cases involving the issue of "uniformity" in bankruptcy legislation); <u>see also</u> Haines, <u>The
Uniformity Power</u>, at 158-64.

      Furthermore, the disuniformity in the application of bankruptcy laws resulting from the
inconsistent and strategic invocation of States' sovereign immunity from bankruptcy
proceedings has been recognized by many courts who must deal with these issues every day.
<u>See, e.g.</u>, <u>Official Committee of Unsecured Creditors v. New York State Dep't of State (In re
Operation Open City, Inc.)</u>:

      Bankruptcy is a collective process in which all parties share in an inevitably
      inadequate estate. The bankruptcy court is the forum in which all parties resolve
      disputes regarding distribution of estate assets. This process, however, cannot
      function properly if any significant participant remains immune from the system's
      fundamental rules. This adversary proceeding involves a governmental unit
      which has extracted funds from a debtor's estate without seeking prior court
      approval and now claims that sovereign immunity precludes this Court from
      reviewing the governmental unit's actions.

148 B.R. 184, 185-86 (Bankr. S.D.N.Y. 1992), <u>aff'd</u> 170 B.R. 818 (S.D.N.Y. 1994); <u>see also</u> <u>In
re McVey Trucking, Inc.</u>:

      If the federal courts were not able to order a state to turn over assets to a
      bankruptcy estate, then any state owed money by a debtor having financial
      problems would have a strong incentive to collect whatever funds it believed to
      be due as rapidly as possible – even if this pushed the debtor into insolvency –
      rather than risking the possibility of recovering only a portion of their debt in any
      subsequent bankruptcy proceedings. In effect, we would be holding that the
      Constitution makes a state a preferred creditor in every bankruptcy. The very

_____

existence of this power would doubtless encourage other creditors to accelerate
their collections. The end result would be an increase in bankruptcies and a
distortion of the system of preferences that Congress has carefully crafted. We
seriously doubt that either the Eleventh Amendment or the doctrine of sovereign
immunity demands such a fundamental disruption of the bankruptcy system.

812 F.2d 311, 328 (7th Cir. 1987); King v. Florida Dep't of Revenue (In re King):

By ignoring the intent of the framers of the Constitution and indulging the states
in their calculated disregard of federal bankruptcy law, a class of super creditors
emerges . . . "able to use its sovereign immunity, not as a means of protecting
itself, but as a mechanism for gaining an unfair advantage at the expense of
other creditors." . . . This is another troubling scenario that is currently being
played out in this Court. Florida has taken money that was part of the bankruptcy
estate. Were this a Chapter 7 case, Florida would effectively be seizing for itself
a position above all other priority and general unsecured creditors, rendering the
priority system set by Congress meaningless and thereby usurping a power
expressly granted to Congress by the Constitution.

280 B.R. 767, 773 (Bankr. S.D. Ga. 2002) (citations omitted); Metromedia Fiber Network, Inc. v.
Washington Metro. Area Transit Auth. (In re Metromedia Fiber Network, Inc.), 281 B.R. 524,
530 (Bankr. S.D.N.Y. 2002) ("There can be no doubt that the invocation of sovereign immunity
by states after *Seminole* . . . gives rise to serious anomalies in and obstacles to the Article I,
Section 8 mandate to Congress to establish (and the courts to administer) 'uniform Laws on the
subject of Bankruptcies throughout the United States.'"); Lankford v. Texas Comptroller of
Public Accounts (In re Lankford), 261 B.R. 410, 413 (Bankr. N.D. Tex. 2001) (stating that the
effect of State's invocation of the Eleventh Amendment has been to "permit a state to usurp or
frustrate the people's grant of bankruptcy power to the Congress . . . ."); Lees v. Tennessee
Student Assistance Corp. (In re Lees), 252 B.R. at 448-49 (Bankr. W.D. Tenn. 2000) ("[the
State's] legal position [that it is immune from the bankruptcy proceeding] . . . summarily
frustrates and denies the full meaning and effectiveness of the uniform and remedial laws of the
United States Congress relating to bankruptcy").

Many in the academic community have also recognized the particular way in which
State immunity from complete enforcement of the Bankruptcy Code may undermine the
essential function and purposes of bankruptcy legislation. See, e.g., Ron S. Chun, Avoiding a
Jurassic Dinosaur Run Amok: Circumventing Eleventh Amendment Sovereign Immunity to
Remedy Violations of the Automatic Stay, 98 Com. L.J. 179, 223 (1993) (noting that one
"possibility is that government entities can strong-arm debtors into making preferential transfers
by denying them governmental benefits or entitlement" without fear of recovery of such
transfers in bankruptcy).

The particular problems posed by conflicts between individual State interests and
bankruptcy laws were also noted by F. Regis Noel in 1919. In an excellent review of the
Framers' concerns that prompted the particular wording of the Bankruptcy Clause, Noel
concluded:

If we look to the confusion and injustice arising from the lack of uniformity under
the Confederation; if we consider the exaggeration of this condition during the
attempt by the States to administer this function of the government; if we look to
the discussions of the Convention which placed the clause in the *Constitution*,
and the expositions of the *Constitution* and the particular clause by the most
competent authorities; if we look to the sources from which the provision was
derived; if we dissect, analyze and construe the phrase; if we look anywhere and

31

the choice to affirmatively grant to Congress the power of uniformity in bankruptcy supports this Court's finding that the Framers intended that the Constitution would alienate States' sovereign immunity with regard to bankruptcy matters upon ratification.

C. The <u>Hans</u> Presumption, the Bankruptcy Courts and the Preferential Transfer

In <u>Hans v. Louisiana</u>, the Supreme Court articulated the principle that, because the Constitution was not generally intended to upset long-established principles of sovereignty, inquiry regarding the scope of the States' sovereignty must always proceed with "the presumption that no anomalous and unheard-of proceedings or suits were intended to raised up by the constitution – anomalous and unheard of when the constitution was adopted." 134 U.S. 1, 18,10 S. Ct. 504, 33 L. Ed. 842 (1890).

It is with great caution, therefore, that this Court proceeds to determine that the States here are amenable to suit in a federal bankruptcy court for the possible recovery of pre-bankruptcy transfers. Even though the Framers intended, as reflected in The Federalist papers, that the ratification of the Constitution would alienate the States' sovereign immunity with respect to bankruptcy matters, if the present discrete proceedings were "actions unknown to the law," when the Constitution was drafted and ratified, <u>Hans</u>, 134 U.S. at 15; 10 S. Ct. 504, then this Court would be compelled to question whether that alienation of sovereignty also includes the present adversary proceedings. Indeed, the Defendants strenuously urge this Court to find the present proceedings to be just such

---

everywhere except to petty State jealousies and special interests, we can see but one and the same necessary purpose and meaning, and they can not be more clearly, adequately and unmistakably expressed than by the words of the clause itself; that, the laws on the subject of bankruptcies shall be promulgated by the Congress of the United States and shall be uniform throughout the Federal territory.

F. Regis Noel, <u>A History of the Bankruptcy Law</u> 122-23 (William S. Hein & Co. 2003).

"anomalous and unheard of" proceedings – "actions unknown to the law" – and, therefore, beyond the contemplation of the Constitution's drafters and ratifying States.

The type of suit at issue in <u>Hans</u>, the Supreme Court held, not only deviated from common law principles of sovereignty, but  was completely "unknown to the law" at the time of ratification; thus, there was no basis on which to found the federal court's jurisdiction over the plaintiff's claims against the State.[35]

An historical analysis of the unique jurisdiction afforded to bankruptcy courts and the treatment of preferences from early English bankruptcy law through the time of the Constitution's ratification shows that the proceedings before this Court are not like the action before the federal court in <u>Hans</u>. The proceedings brought by the Plan Administrator do not constitute the type of anomalous and unheard of proceedings that offend the States' sovereignty and run afoul of the Eleventh Amendment. Instead, the conclusion drawn from The Federalist papers – that the States ceded their sovereignty in bankruptcy matters – is consistent with the traditional jurisdiction and subject matter of bankruptcy courts.

1. The Unique Jurisdiction of Bankruptcy Courts

Although the history of the evolution of bankruptcy courts in England is complicated,[36] and need not be repeated here, it is at least clear that at the time the

---

[35] The question in <u>Hans</u> was whether the federal district court could assert jurisdiction over a defendant State on the basis of Article III's grant of "judicial Power . . . [over] all Cases . . . arising under [the] Constitution . . ." U.S. Const. art III, § 2, cl. 1. The plaintiff alleged that the State's refusal to pay amounts due under a contractual agreement constituted a "Law impairing the Obligations of Contracts" prohibited by Article I, section 10 of the Constitution; therefore, the plaintiff's claim, although essentially a claim for breach of contract, was one "arising under" the Constitution.

[36] <u>See, e.g.,</u> David S. Kennedy & R. Spencer Clift, III, <u>An Historical Analysis of Insolvency Laws and Their Impact on the Role, Power and Jurisdiction of Today's United States Bankruptcy Court and Its Judicial Officers</u>, 9 J. Bankr. L. & Prac. 165, 165 (2000) ("The historical development of the bankruptcy court is endlessly fascinating and permeated with

Framers were contemplating a grant of power over bankruptcy laws to the Congress the English "[c]ourts of bankruptcy . . . were . . . separate, distinct organizations, with powers and jurisdiction separate and distinct from all other courts. . . ."[37] Orlando F. Bump, Law and Practice in Bankruptcy 209 (Baker, Voorhis & Co., 1877). The notion that bankruptcy courts "possess[ ] power and jurisdiction peculiar to themselves," id., persisted in America as well, despite the fact that district courts *were* the bankruptcy courts. 1 Loveland, Law and Proceedings in Bankruptcy, at 44.[38]

This is most evident from the sharp contrast between jurisdiction granted to the federal bankruptcy courts shortly after the Constitution's adoption and the more restricted jurisdiction granted to federal courts by the first Congress. The Judiciary Act of 1789, which

---

complexities, controversy and politics.").

[37] There is no question that the Framers had the English bankruptcy system in mind at the time they were drafting the Constitution. See Kennedy & Clift, Historical Analysis of Insolvency Laws, at 168 (quoting Sexton v. Dreyfus, 219 U.S. 339, 31 S. Ct. 256, 55 L. Ed. 244 (1911) ("We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system . . . .")); Charles J. Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr. Inst. L. Rev. 5, 7 (1995). It has since been established that Congress is not limited to historical English bankruptcy concepts in exercising its bankruptcy powers. See 1 Loveland, Law and Proceedings in Bankruptcy, at 19 (citing In re Reiman, No. 11673, Fed. Cas., 7 Ben. 455; In re Klein, 1 How. 277; In re Silverman, No. 12855, Fed. Cas., 1 Saw. 410). Yet, understanding the English bankruptcy system is important for understanding the Framers' reference point for bankruptcy legislation and practice.

[38] Addressing the use of the district courts as courts of bankruptcy, it was said of the Bankruptcy Act of 1867:

> Courts of bankruptcy, as they existed in England . . . were, and still are, separate, distinct organizations, with powers and jurisdiction separate and distinct from all other courts; and it is, undoubtedly, in this sense that the words are used in the [Bankruptcy Act of 1867]: that is, courts possessing power and jurisdiction peculiar to themselves. The only difference is, that here instead of creating a new organization, an organization already existing, known as the district court, is taken up and made use of in lieu of such new organization. But the district court, when acting as a court of bankruptcy, is none the less a separate and distinct court, exercising powers and jurisdiction as a distinct court, than if it were such separate and distinct organization. . . .

Bump, Law and Practice in Bankruptcy at 209.

controlled federal court jurisdiction for nearly a century, contained no provisions granting

general federal question jurisdiction.  See 1 Cong. 20, 1 Stat. 73 (1789). "[I]t was not until

1875 that Congress enacted a permanent general federal question statute." Merrell Dow

Pharms., Inc. v. Thompson, 478 U.S. 804, 807, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986);

Moore's Federal Practice, § 130.30 (2005).[39] Despite the lack of general federal question

jurisdiction, however, the adjudication of bankruptcy matters under the 1800, 1841, and

1867 Acts was ultimately reserved to the [federal] district court." Kennedy & Clift,   An

Historical Analysis of Insolvency Laws, at 185.[40]

Early Supreme Court cases emphasized the importance of the federal bankruptcy

courts' jurisdiction under the 1841 and 1867 Acts. In Ex parte Christy, for example, the

Court affirmed the jurisdiction of the federal District Court, sitting as a bankruptcy court,

over a suit brought by an assignee in bankruptcy against an adverse third party that had

not filed a claim in the bankruptcy case. 44 U.S. (3 How.) 292, 11 L. Ed. 603 (1845). In

upholding federal jurisdiction over bankruptcy matters, Justice Story stressed the necessity

for a system of bankruptcy adjudication that was "capable of being worked out through the

---

[39] Under the Judiciary Act of 1875, the federal district courts were given jurisdiction over civil suits where the claim exceeded $500 and which "[arose] under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority . . . ." 43 Cong. 137, 18 Stat. 470 (1875).

[40] Although the Bankruptcy Act of 1800 did not specify a jurisdictional scheme for the resolution of bankruptcy matters, see Bankruptcy Act of 1800, ch. 19, 2 Stat. 19, repealed by Act of Dec. 19, 1803, ch. 6, 2 Stat. 248; Duane Loft, note, Jurisdiction Line-Drawing in a Time When So Much Litigation is "Related To" Bankruptcy: A Practical and Constitutional Solution, 72 Fordham L.R. 1091, 1098 & n.48 (2004) (the federal courts relied on Article III of the Constitution for their jurisdiction over bankruptcy matters pursuant to the 1800 Bankruptcy Act), the Bankruptcy Acts of 1841 and 1867 both granted jurisdiction over bankruptcy matters to the federal courts, see Bankruptcy Act of 1841, ch. 9, § 6, 5 Stat. 440, repealed by Act of Mar. 3, 1843, ch. 82, 5 Stat. 614 (granting jurisdiction to bankruptcy courts over "all acts, matters, and things to be done under and in virtue of the bankruptcy"); Bankruptcy Act of 1867, ch. 176, §1, 14 Stat. 517, repealed by Act of June 7, 1878, ch. 160, 20 Stat. 99 (granting original jurisdiction to bankruptcy courts in "all matters and proceedings in bankruptcy").

instrumentality of the [federal] courts, independently of all aid and assistance from any

other tribunals over which it could exercise no effectual control." Id. at 312. And in Lathrop

v. Drake, the Supreme Court characterized the grant of federal jurisdiction over bankruptcy

matters under the 1867 Act as "very broad and general" and, within the federal courts'

respective districts, as "extend[ing] to all matters and proceedings in bankruptcy without

limit." 91 U.S. (1 Otto) 516, 517, 23 L. Ed. 414 (1876).

From an historical perspective, therefore, the Defendants' reliance on the lack of

general federal question jurisdiction until 1875 as evidence that the Framers and early

Congresses did not intend to subject the States to federal jurisdiction in bankruptcy matters

is misplaced. In fact, the grant of federal jurisdiction over bankruptcy matters in the

absence of broad federal question jurisdiction demonstrates that the English notion of

bankruptcy courts as courts of separate and distinct jurisdiction persisted at the time of the

Constitution's ratification. Thus, an historical analysis of bankruptcy court jurisdiction

demonstrates that the Framers and the ratifying States contemplated the vesting of power

to adjudicate bankruptcy proceedings in the federal courts.

### 2. Early Bankruptcy Legislation and the States

Both the United States and the individual States have historically received priority

treatment under federal bankruptcy legislation – a continuation of the priority granted to the

sovereign under English bankruptcy law. [41] Contrary to the Defendants' contention,

---

[41] Although the English sovereign was entitled to priority payment of its debts owed by a bankrupt, this priority was not unlimited; the English sovereign found itself in a position similar to the States today with regard to non-tax debts, for which there is little or no provision for priority. In fact, under earlier English bankruptcy law, debts owed to the Crown were only given the highest priority and exempted from discharge if the debt was for taxes owed. Where the debt was founded upon contract, the Crown was essentially treated like an ordinary creditor. See Board of Chosen Freeholders v. State Bank, reprinted in The State as a Preferred Creditor, 17 Alb. L.J. 268 (1878).

however, there was no historical understanding that federal bankruptcy legislation did not "apply" to the States.

The earliest bankruptcy legislation passed by Congress specifically addressed debts due to the United States and the individual States:

> [N]othing contained in this law shall, in any manner, effect the right of preference to prior satisfaction of debts due to the United States as secured or provided by any law heretofore passed, nor shall be construed to lessen or impair any right to, or security for, money due to the United States or to any of them.

Bankruptcy Act of 1800, 2 Stat. 19, § 62. In United States v. Fisher, 6 U.S. (2 Cranch) 358 (1805) and Harrison v. Sterry, 9 U.S. (5 Cranch) 289 (1809), Chief Justice Marshall, writing for the Court, rejected arguments that § 62 merely restated the principle that the sovereign was not bound by bankruptcy laws.   Fisher, 6 U.S. at 395; Sterry, 9 U.S. at 299-300. Instead, Justice Marshall explained that the 1800 Act *did* apply to the United States (and the individual States),[42] but § 62 created an *exception* to the general rules of bankruptcy distribution found in §§ 29 and 30. See Sterry, 9 U.S. at 299-300. If the 1800 Act was inapplicable to the sovereign, an exception would be unnecessary to give the sovereign priority.

Priority treatment for both the United States and the individual States continued through subsequent bankruptcy legislation[43] and still obtains under the present Bankruptcy

---

[42] Although the cases discussed in this section involve the United States, the language of § 62 treats the United States and the individual States in an identical manner. Thus, for purposes of deciding the effect of the Bankruptcy Act of 1800 on the States, the Supreme Court's analysis with regard to the United States as sovereign would apply equally to the States as sovereigns.

[43] See Bankruptcy Act of 1867, 14 Stat. 543, § 28 (granting second priority in distribution of estate assets to tax and other debts owing to State in which Bankruptcy proceedings are pending and fifth priority to all debts that would have priority under non-bankruptcy law - thus preserving any priority the States would give themselves for taxes or non-tax debts);

Code.[44] This priority status, whether allowing for payment before other creditors, or excepting State debts from discharge, has specifically placed State debts within the consideration of each act of federal bankruptcy legislation.

### 3. Avoidance and Recovery of Preferences

Avoidance and recovery of preferences was similarly not "anomalous and unheard of" at the time the Constitution was drafted. The concept of a preference was recognized very early in English bankruptcy law. The general contours of the preference were recognized by Lord Coke in 1584,[45] and by 1758, the English Courts began to "explicitly address the legality of a preferential transfer in the modern sense," Robert Weisberg, Commercial Morality, the Merchant Character, and the History of the Voidable Preference, 39 Stan. L. Rev. 3, 46 (1986), as evidenced by Lord Mansfield's opinion in    Worsely v.

---

Bankruptcy Act of 1898, 30 Stat. 544, § 17 (excluding from discharge any taxes owed to the United States or the State, county, district or municipality in which the debtor resides) and § 64 (providing for priority payment for all taxes owed to the United States or a State, county, district or municipality). The Bankruptcy Act of 1841, 5 Stat. 410, § 5 gave priority to all debts owed to the United States. Although that section specifically referred to the "United States," it is unclear whether this language referred solely to the federal entity or also to the individual States. Given that the 1800 Act referred to the individual States as the "United States," it is assumed that the 1841 Act would have been interpreted in a like fashion.

[44] See, e.g., 11 U.S.C. §§ 726(a) and 507(a)(8) (priority for certain taxes owed to governmental units, including the States); §§ 523(a)(1), (7), (8) and (18) (excepting from discharge certain taxes and debts owed to or guaranteed by a governmental unit, including the States).

[45] The Case of Bankrupts, 76 Eng. Rep. 441 (K.B. 1584). In that case, as explained more cogently by others, the question was whether a transfer made to a creditor after the debtor committed an "act of bankruptcy" (i.e., became insolvent) was void, even though the transfer was made before the commission in bankruptcy was appointed. See Robert Weisberg, Commercial Morality, the Merchant Character, and the History of the Voidable Preference, 39 Stan. L. Rev. 3, 40-41 (1986); Garrard Glenn, The Diversities of the Preferential Transfer: A Study in Bankruptcy History, 15 Cornell L.Q. 521, 527-28 (1930). Lord Coke answered in the affirmative, holding that "it would be unequal and unconscionable, and a great defect in the law, if, after that he hath utterly discredited himself by becoming a bankrupt, the law should credit him to make distribution of his goods to whom he pleased . . . ." Weisberg, History of the Voidable Preference, at 40-41 (quoting The Case of Bankrupts, 76 Eng. at 473).

DeMattos, where it was held that a bankrupt debtor's voluntary payment to a creditor, not in the "regular and common course of dealing and business," was "a fraudulent transaction and therefore void with respect to the other creditors." 1 Burr. 467, 482, 96 Eng. Rep. 1160 (K.B. 1758).

This idea that preferential transfers disrupt the fundamental purpose and function of the bankruptcy laws was well established by the time the Framers were drafting the Constitution and early Congresses were debating and creating the first bankruptcy legislation. This is evident from State insolvency laws in place shortly before and after the Constitution's ratification that recognized preferential payments to creditors as void. In Maryland, for instance, insolvency laws allowed for the recovery of preferences as early as 1638,[46] and also permitted such recovery in "An Act Respecting Insolvent Debtors" passed in 1787.[47] State insolvency laws in Vermont and Delaware in the early 1800's similarly included provisions aimed at discouraging preferential transfers.[48]

Furthermore, the concept of the preferential transfer has long been recognized as

---

[46] Hein, A History of the Bankruptcy Law, at 43-44. Maryland's "complete act for the recovery of debts" passed in 1638, "corresponded accurately to the English bankruptcy measures of that period, and . . . may be considered the first formulated bankruptcy law on the American continent." Id.

[47] See An Act Respecting Insolvent Debtors, ch. 34, Apr. Sess., 1787 Md. Laws, discussed in Thomas E. Plank, Bankruptcy and Federalism, 71 Fordham L. Rev. 1063, 1086-87 (2002).

[48] For example, Vermont law in the late 1700's prevented debtors from taking the poor debtor's oath (which would release them from prison) if they had made any payment to creditors while in prison. This act was amended in the early 1800's to allow the oath for such prisoners, but only if they had not given a preference to any creditor, had not made a payment fraudulent to the committing creditor and had not concealed property. See Peter J. Coleman, Debtors and Creditors in America: Insolvency, Imprisonment for Debt, and Bankruptcy, 1607-1900 69 (1974). And in Delaware, legislation passed in the early 1800's "deprived the debtor of the benefit of the relief legislation" if the debtor had made preferential assignments of property. Id. at 212.

unique to bankruptcy.[49] The choice to pay one creditor over another may be acceptable

outside of the bankruptcy context, but within the collective forum of bankruptcy, preferential

payments disrupt the established priority scheme. In fact, although the discharge of debts

was not a central feature of English and early American bankruptcy law, the brief history

traced above demonstrates that the avoidance of preferences has played a pivotal role in

bankruptcy legislation from its earliest English roots through the present.[50] Therefore, the

---

[49] See Robert Weisberg, Commercial Morality, The Merchant Character, and the History of the Voidable Preference, 39 Stan. L. Rev. 3 (1986) ("Indeed, the preference, unlike its somewhat mismatched partner, the fraudulent conveyance, is strictly a creature of bankruptcy law, rather than a part of nonbankruptcy commercial law that simply receives special enforcement in the bankruptcy process.").
    Excellent discussions of the evolution of the preferential transfer and modern peference law can be found at: Robert Weisberg, Commercial Morality, The Merchant Character, and the History of the Voidable Preference, 39 Stan. L. Rev. 3 (1986); Vern Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand. L. Rev. 713 (1985); Garrard Glenn, The Diversities of the Preferential Transfer: A Study in Bankruptcy History, 15 Cornell L.Q. 521 (1929).

[50] Although the concept of the "fresh start" has become a central feature of American bankruptcy law, see Lines v. Frederick, 400 U.S. 18, 19, 91 S. Ct. 113, 27 L. Ed. 2d 124 (1970) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934)), the fundamental purpose of bankruptcy and insolvency laws in English and early American society was to provide a collective proceeding that protected creditors from each other and from the debtor. See, e.g., Plank, Bankruptcy and Federalism, at 1078 (noting that the creation of a collective creditor proceeding was the common feature of both English and American bankruptcy laws at the time the Constitution was adopted); Peter J. Coleman, Debtors and Creditors in America, at 12-13 (noting that the objectives of colonial bankruptcy laws were not only humanitarian, but also included "halt[ing] the race to bring individual suits against defaulters, . . . reduc[ing] the incidence of fraud" and equitably distributing an insolvent's property).
    The preference provisions of the current Bankruptcy Code continue this tradition. As one well-respected author notes, "[f]rom the perspective of the creditors' bargain theory, bankruptcy exists at its core to maximize the value of assets in the face of individualized pressures to ignore the collective weal for individual gain"; as such, "[p]reference law is part and parcel of the substitution of collective remedies [in bankruptcy] for individual remedies." Thomas H. Jackson, Avoiding Powers in Bankruptcy, 36 Stan. L. Rev. 725, 729, 758 (1984); see also Glenn, The Diversities of the Preferential Transfer, at 525 (bankruptcy laws have "two important purposes, to prevent preferences and to give discharges") (citing James A. McLaughlin, Amendment of the Bankruptcy Act, 40 Harv. L. Rev. 341, 358 (1926); Charles Seligson in The Code and the Bankruptcy Act: Three Views on Preferences and After-Acquired Property, 42 N.Y.U. L. Rev. 278, 292 (1967):
    A cornerstone of the bankruptcy structure is the principle that equal treatment for

"subject of bankruptcies," as intended by the Constitution's drafters and as understood by the ratifying States, would necessarily have included the concept of the voidable pre-bankruptcy preferential transfer.

In sum, this Court finds that the present proceedings commenced under the Bankruptcy Code to avoid and recover preferential payments are not the kind of "anomalous and unheard of" proceedings contemplated by the Supreme Court in Hans. Given that the Constitution's drafters and the ratifying States would have conceived of a bankruptcy court with unique jurisdiction and would have understood the subject of bankruptcy to include the concept of the preferential transfer, and given that the earliest federal bankruptcy legislation vested jurisdiction over bankruptcy matters in the federal courts and was clearly intended to apply to sovereign debts, this Court finds that the States' alienation of sovereign immunity with regard to bankruptcy included the alienation of their sovereign immunity with respect to the present adversary proceedings.[51]

---

those similarly situated must be achieved. It would be highly inequitable to disregard what transpires prior to the filing of the bankruptcy petition; to do so would encourage a race among creditors, engender favoritism by the debtor, and result in inequality of distribution.

In fact, the legislative history of the 1994 amendments to the Bankruptcy Code continue to stress the primary importance of equitable distribution as a purpose of federal bankruptcy laws. H.R. No. 103-835, at 32-33 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3341 ("The second objective of the bankruptcy system is to protect creditors in general by preventing an insolvent debtor from selectively paying off the claims of certain favored creditors at the expense of others.") (cited in United States v. Nebraska Dep't of Revenue (In re Doiel), 228 B.R. 439 (D.S.D. 1998).

[51] Because this Court has ruled that the States have not retained their sovereign immunity with regard to bankruptcy matters, the Plan Administrator's proposed "marketplace participant exception" to sovereign immunity need not be addressed. In addition, the request for relief under § 502 is not ripe for review, since none of the Defendants have filed proofs of claim in the Debtor's main case and, at any rate, disallowance under § 502 first requires a determination that the Debtor did, indeed, make one or more preferential transfers to a defendant. See 11 U.S.C. § 502(d).

41

IV.    <u>CONCLUSION</u>

For all the foregoing reasons, this Court rules that the Defendants' criticisms of §
106(a)'s constitutionality are inapposite.  This Court holds that § 106(a) is inapplicable in
the present cases because the Eleventh Amendment does not apply to the recovery of
voidable preferences under the Bankruptcy Code.  Accordingly, the Defendants' Motions
to Dismiss will each be DENIED.

Separate Orders in conformity with this Memorandum shall enter forthwith.

DATED: June 27, 2005                    By the Court,

                                        _____
                                        Henry J. Boroff
                                        United States Bankruptcy Judge